Consolidated cases 20-6245, 6426, 6427, and 6428, USA v. Sylvia Hofstetter et al. 40 minutes for plaintiff, 40 minutes to be shared by defendants. Mr. Oldham, you may proceed for Appellant Newman. Good afternoon. May it please the Court, Christopher Oldham of the Knoxville, Tennessee Bar on behalf of the Appellant Courtney Newman. I'd like to reserve three minutes for rebuttal. Your Honor, this matter is back before this Court. Are you going to be arguing essentially the same thing on the 856, or are there... My understanding is that's what we're here for, but I don't know whether you all have different plans. That's probably a good jumping off point, Your Honor. The argument that we're here to make today is that the 856 counts and Section 856 of the Controlled Substances Act should be treated exactly the same for the purposes of Ruan and the subsequent Anderson case as Section 841. In the Controlled Substances Act, Title 21, there are two statutes that have the accept as authorized clause and then have the knowingly standard, 841, and then 856 has the exact same standard. And I think the government agrees with you on that, or at least I didn't read their brief as taking any issue with it. But I think the real question for the 856 is, so assume accept as authorized, it's the same thing as 841. I guess number one, was the instruction defective? Number two, was it harmless error? That's what I'm curious about. And I think it's plain error, right, that applies here. So it would ultimately be a question of whether the integrity of the proceedings was also affected. I think that it would be. I think that the court might look at it from a plain error standpoint, too, because clearly after Ruan and after Anderson, clearly the instruction is faulty because the instruction as written by the court there, there was a general statement of the law that was thrown in in the middle section of the instructions, and it says that it only applies to 841. But 856, the way that the 856 counts were instructed at the trial court level was that the appellants were operating or using the premises for the purposes of illegally distributing controlled substances. So the bad act is the illegally distributing controlled substances. So it's that 841 standard that I think applies here. And then all the general statements of law would influence how a juror would view the 856 because it is just maintaining a place isn't a crime. It's the subsequent instruction for the purpose of distributing a controlled substance. In the original opinion that we have in this case that we wrote, that Judge Cole wrote, we focused, I think, at least on the original instruction issue on 856, we mentioned and focused on the word illegally for the purpose of illegally distributing. This is on page 196 of the jury charge transcript. Why isn't that enough to cover the Ruan issue, given that on pages 158 and 159, with respect to count 13, it talks about maintaining a business for the purpose of illegally distributing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose. So that's the authorization part. We use illegally twice here. Why is that not enough to cover the subjective part that Ruan instructs us to cover? Because the court gave a very specific instruction that said, you are to consider the evidence, the prescriptions, from an objective standpoint and not from a subjective. The language of the court says, finally, whether a prescription is made in the usual course of professional practice is to be determined from an objective and not a subjective viewpoint. That's where you come in violation with both Ruan and Anderson. But why is that not consistent with what Ruan says about how if you want to look, you can certainly look at the objective standard when you're deciding whether somebody has the subjective knowledge or not. You sort of get into a circular loop there, because the Ruan court has said that the standard within the scope of professional practice and without legitimate medical purpose is viewed from a subjective, not an objective. So it's not really an objective standard. Did the person knowingly not write the prescription within the bounds of professional practice and for a legitimate medical purpose? I was reading Ruan to say the farther that you deviate from an objective standard, the more likely it is that you have subjective knowledge. I mean, that's something a jury could find. It's like you're so far out of bounds that, because, look, absent a smoking gun, proving knowledge is very difficult, right? And so, you know, we make inferences. Juries draw inferences from objective evidence all the time. So it would involve an objective standard, but it would still, we would be getting at subjective intent. So when looking at it from that way, when confirmed with that, what did the jury do? They acquitted the defendants of the 841 charges, at least the provider defendants. Why doesn't the Anderson case take care of the issue before us here now? Because in the Anderson case, the court said, well, if there's a good faith instruction, for example, and it subsumes both objective and subjective. But once again, you go to the limiting instruction, because in Anderson, this court said that absent some limiting language, that good faith includes both objective and subjective, we've got that limiting language here. The court said whether a prescription is made in the usual course of professional practice is to be determined from an objective and not a subjective. That's limiting language. That takes the subjective out of it completely. So I think Anderson does apply here, and I think that the court gave us why it would apply here. It says absent that limiting language, here is the case with the limiting language that court was looking for. The good faith instruction and also the objective, subjective viewpoint language, all of that was, I'm trying to understand, all of that seemed to be done in the context of the 841 counts as opposed to count the 856 counts. Is that your understanding, too, that they were broken out that way? They were broken out, the general statement of law that you're talking about, it followed immediately the maintaining a premises charge, the 856, and immediately preceded the 841. And it was talked about in the context of the 841 charges. But once again, the 841, the maintaining a premises is not a crime without the illegal distribution of drugs in this case. No, I understand that. So when you've got a defective instruction at that point, then I think it goes back to the 856 because it so totally is subsumed by the 841 instruction. Okay, thank you. Would that objective, subjective instruction be any different if you started that sentence as the district judge did initially, said finally whether a practitioner, then he said finally whether a prescription is made. What if it just said, is it different if it says a practitioner knew or subjectively issued the prescription as opposed to just a prescription is made? Is there a distinction there? To be honest with you, Your Honor, I have not thought about that, but it seems to me that if it does instruct the jury, once again, that you cannot consider anything about prescription from a subjective point of view. What did the provider know versus what a reasonable medical professional might know. I don't think how you preface it would matter as long as you're denying the jury the opportunity to view the evidence from a subjective standpoint versus an objective standpoint.  Thank you, Your Honor. Good afternoon. I'm Randall Reagan here representing Cynthia Clemons. I would like to reserve three minutes of my time for rebuttal. The three providers in this case, Ms. Clemons, Ms. Newman, and Holly Womack, are all pretty much in the same position. They're all authorized, they're all certified, they're all authorized by the DEA to prescribe controlled substances, and they all fall within that except as authorized clause. What difference is your argument as against the previous defense counsel's argument? Is it the same thing? Pretty much the same thing, Judge. One thing I would like to point out is under rule one, when Judge Barlon instructed the jury that whether a prescription is illegal is to be judged whether the provider knew that they were prescribing illegally, is to be judged from an objective and not a subjective viewpoint. And if rule one had been decided before that trial, that instruction would never have been given. It shouldn't have been given. If we were to look at the instructions in context, as a whole, not just any one part of them, we do have the language where the court is saying for the purpose of illegally distributing Schedule II controlled substances in violation of 856. And there's other language about illegality. How do you respond? When the trial judge gave the instructions on the 841 counts, he used the language without a legitimate medical purpose and outside the scope of professional practice as elements in those offenses. When he instructed on the 856 violations, he did not use that language in those. And, in fact, he only instructed on two elements in the 856 violations. One is that they maintained or opened the present premises for the distribution of controlled substances, and the controlled substances were distributed from there. You weren't trial counsel, were you? Yes, sir. Oh, you were. Did you ask for a subjective issue to be presented to the jury? We requested a good faith instruction. Good faith, okay, but not subjective, the statement. Good faith might have been a better term for the jury, but you didn't ask for the subjective. We did ask for good faith, and that was the whole basis of our defense. I mean, that was my whole argument during the trial. I pointed out everything that Cynthia Clemons did to show that she was trying to follow. Did you ask for a good faith instruction specifically with respect to count the 856 counts? With respect to what makes the distribution or the dispensation providing the prescriptions, yes, that was what that count was for, because that was the whole basis of our defense was they did not intend to violate this statute. But what was given, so the good faith instruction here, this is what I was saying before. It's given on page 203 in the context of counts 14, 16, and 18, the 841 counts. Yes, sir. Was it understood that that instruction also pertained to 856? Like I don't see a link between that instruction and 856, which ironically enough may benefit you now because of Ruan, but I'm not seeing a way for the jury to link that other than through the usual course of professional practice that was also mentioned with regard to when count 13 was introduced. I mean, is that the only link between good faith and 856 in this record? Well, I think the judge didn't instruct them again that if the defendant reasonably believed they were following the law or writing a legal prescription, the basis of liability under both those statutes is the same for our clients, was that they illegally prescribed controlled substances outside the scope of professional practice without a legitimate medical purpose. That was the basis of liability on 841 and 856. But your client, I guess it's interesting to me that your clients, even if this was objective, even if this was objective and was pertained only, it seemed to pertain mostly to 841, your clients were acquitted of any of the 841 counts. Yes, sir. So then when we get to 856, I don't know whether we, I suppose they would have, perhaps would have benefited from a more explicit instruction, but I guess it's not clear. I think they would have because the counts that those, that the judge instructed, the element of prescribing without a legitimate medical purpose outside the scope of professional practice, he explicitly gave them those instructions as part of that offense. Those were the ones they were acquitted of. He did not use that language when he instructed them on the 856 violation. But I guess the other problem I've got is under Anderson, it looks to me like this 841 instruction is almost exactly the same. I mean, the language that's quoted in Anderson must be from a forum jury instruction or something because it's the language that we have in this case, right? It is, except I think, and I didn't have a lot of time to study Anderson, but I think in Anderson, in our case, in the good faith instruction, Judge Baldwin used the word if the provider reasonably believes that they are acting lawfully. And that reasonably brings in from the outside, it makes it an objective standard at that point. And also I can't tell from reading Anderson whether or not the judge in that case gave the exact instruction that the trial court gave was that the determination of whether a prescription is legally written must be determined by an objective and not a subjective standard. Okay, any questions? Okay, thank you. Thank you. Thank you. May it please the court. Karen Sevier with the Federal Public Defender's Office on behalf of Appellant Holly Womack. Your Honor, to follow up on the court's questions regarding the good faith instruction, I agree with the court that that instruction was given pertaining to counts 14, 16, and 18. That instruction, based on the reading of the record, was limited to those counts only and did not apply to count 13, which is the count of conviction in Ms. Womack's case. That is particularly problematic because at no point then was the jury asked to answer the question as to whether or not Ms. Womack subjectively knew that she was acting without authorization. But what request was made to the court for that instruction that you're now proposing? Was that given? Were you in the case, I guess I should say? I was not. I was not a trial attorney in that case. Your patent predecessor, was that requested to the court? There was a request made for a good faith instruction. My reading of the charging conference is that the defense attorneys were asked where they wanted that instruction to be placed within the context of the entirety of the jury instructions and whether or not they wanted it to be presented as a general defense to all of the charges. What did defense counsel say? Defense counsel said that each defendant was positioned differently and that they wanted it where it was placed. I believe that the court ultimately made the decision as to where to place it within the context of the other instructions. There's no objection here. You waived your objection or your client did because you asked the court to put it where it wanted to and it did that. That's correct, Your Honor. There was no objection from any of the defense counsel at the district court level. However, now we're taking a look at this case through a different lens, through a new substantive rule of law. When we apply RUAN and look at how the jury was instructed here, we see not only does the good faith instruction not save the situation, the good faith instruction was only applied to certain counts and the good faith instruction was an objective good faith instruction. It was not a subjective one. Even if the court wants to view this good faith instruction as applying to all of the counts in the indictment, we know because the attorneys requested the Volkman instruction, that this was in fact an objective good faith instruction, which does not comport with RUAN. The good faith instruction here exacerbates the problem, the overall problem, which is that on the 841 counts, they were improperly instructed and they were improperly instructed on the 848-56 count as well because they necessarily had to refer back to the 841 instruction. I think there's a difference between 841 and 856 in this case. And I guess your client is not convicted of 841. Are you saying that we have to find that the 841 instruction was erroneous in order for your client to win? Because under Anderson, I'm not sure we can do that. I mean, again, I look at Anderson and I say these are the exact same paragraphs, the exact same words that are in this instruction, and that was okay. I mean, it was enough to say, you know, that you may find the defendant knew this was the case, defendant was aware of a high probability. I mean, those are the knowledge keys in Anderson and we have them here. So, you know, but your client wasn't convicted of 841. That's correct. So I don't know, but are you saying that we have to toss out the 841 instructions as well? That is not necessary in this case in order to find that the 856 instruction was plainly erroneous. However, I do submit that the 841 instruction was problematic, did not comport with the RUAN, even in the face of Anderson. Anderson does not save this case because Anderson stands for the idea that the deliberate ignorance instruction can comport with RUAN if there are no other problems with the jury instructions as a whole, but that's not the case here. In Anderson, they were not given a good faith instruction, a problematic good faith instruction. This is sort of invited error because your predecessor said that's fine with the judge to put it in instructions the way he wanted to, and he did that, and there was no objection, and now you're saying it's erroneous, right? That's correct, Your Honor. Well, RUAN was not the law at that time, but now that we know that RUAN is in place, we need to take a look at what the situation would have been if RUAN had had to have been followed, and we know that if RUAN had been in place, that there would have been objections lodged because what they were agreeing to, by virtue of this good faith instruction in relation to the 841, is a RUAN and noncompliant good faith instruction. But the difference here between Anderson and our case is that the jury instructions as a whole failed to comport with RUAN. We have an objective... Okay, so why doesn't the additional language in this case, that is objective language, why doesn't it just fall under the RUAN language about that, you know, where it says the government, of course, can prove knowledge of a lack of authorization through circumstantial evidence and the regulation defining the scope of that, et cetera, does so by reference to objective criteria, such as legitimate medical purpose and usual course of professional practice. In other words, you can look at objective things in order to determine whether there's knowledge or not. Why doesn't all of this 841, arguably objective language, fall into that category? Because none of these instructions ask the jury to pass on the ultimate mens rea issue. They don't instruct the jury to look at the ultimate question through a subjective lens. And in fact... Are you talking about 856 or 841? I'm talking about both. But in particular for my client, I'm looking at 856. Well, okay, I understand that, because I'm sure I'd push back a little bit on 841, because there is the language, again, I go back to Anderson, that says new, aware, whatever it is. That seems subjective to me. 856, I think, is a different story. I don't see any tie between the usual course of medical practice and the 856 counts. I see it measured, I see it mentioned, but I don't see a you must find the lack of authorization or that they knew there was a lack of authorization, right, with respect to the 856. That's correct, and that is the crux of the problem, is that there isn't that instruction to the jury to take a look and ask whether Ms. Womack subjectively knew whether she was acting outside the scope of her authorization. That is the issue. And the only way that they get to that to answer the question as to whether that law was violated by virtue of illegally distributing controlled substances is by requiring the jury to get the definition from the 841 instruction, which the government concedes is noncompliant with RUAN. Okay, all right.  All right, thank you. Thank you, Your Honor. Thank you. Good afternoon, Your Honors. Loretta Cravens of the Knoxville, Tennessee Bar for Appellant Sylvia Hofstadter. Instead of beginning where I thought I would begin, I would like to go back to a question the Court just asked my predecessor counsel. I am not going to re-argue anything that my predecessor counsel, my co-defendant's counsel has argued because I believe their argument applies as equally to Ms. Hofstadter's 841-856 convictions as it does to theirs as providers. Were you trial counsel in this case? I was one of Ms. Hofstadter's trial counsel, yes, Your Honor. Did you agree to these instructions or did you have an objection to them? The slight distinction, I think, between Ms. Hofstadter with regard to the request of the jury instructions is that we requested a very specific deliberate indifference instruction that was in accordance with Global Tech. And in that, there was a... Or did the judge give that? The judge denied that request, Your Honor. That's not what you're appealing on now. Well, that was an issue we have appealed on, yes, because our position was that that instruction, if given, would have included a subjective element that would have been more in accordance with Rewind. That instruction was not given and the alternative good faith instruction that we've already been discussing was. So that was objected to and I think that's noted by the government as well in their brief that Ms. Hofstadter did request the Global Tech instruction, which would have required that the jury be instructed that Ms. Hofstadter subjectively believed that a high probability of a fact existed and then took deliberate actions to ignore it. So her subjective belief. So we think that is one distinction there, Your Honor. But the instruction that was given on that point was the... I mean, that's the instruction that was approved in Anderson, right? Very nearly. I think it is very close to that instruction, Your Honor. I mean, it looks exactly the same to me. I guess there's a him and a her there, James, but I... I mean, I understand that there was additional... things that were given in this case that were not necessarily given in Anderson or we don't know. I guess we could check the record in Anderson. But, I mean, the key paragraphs that are quoted in Anderson are in this instruction too. So I guess I'm struggling with why is this case different on the 841? I mean, your co-counsel said, well, and I think it's a good point, that it looks like there's some additional objective stuff that's in here. Is that the argument? I do think that's the argument, Your Honor, at least partially. And in the context of objective criteria, I believe that we were discussing the fact that objective criteria can be looked at by the jury in order to determine subjective intent. And I agree with that sentiment that the court has just shared. But it's objective criteria that can be looked at, not objective intent. And I think that there's a distinction between the use of those two terms, that the jury can view things in an objective manner as to conduct and occurrences, but not necessarily as to the intent of an individual defendant. In this case, Ms. Hofstetter is admittedly slightly differently situated than the other appellants here. She was not a provider, so she was not authorized to write prescriptions. The government's theory of the case was that she hired these providers. She sort of was the businessperson in the whole business, right? She was a business manager  Okay. Yes, Your Honor. But why would that make a difference in terms of our holding in Anderson? I don't know that it changes the holding, Your Honor. It's just a slight distinction. The argument that we are bound by Anderson, nearly identical instruction, maybe a different word here or there. I guess I'm just trying to figure out why we're not, as a panel, required to follow Anderson here I agree, Your Honor. I understand that's a question of the poor hostess story. I do think there's a distinction. If Ms. Hofstetter were an authorized prescriber, I think it would be a closer question. It would be easier for me to answer that question. But because she did not have that authority in the allegation is that she sort of served as a part of an umbrella. She was certainly not alone. Part of an umbrella to employ those providers. What was her knowledge in regard to their criminal liability? Ms. Hofstetter Sitting around in the business and watching these people working for her and passing out the pills and all that stuff. The testimony at trial would be that she was often in her office and traveling amongst there were multiple clinics. I think three were the most at any given one time at issue. That she would travel between the clinics. There was testimony at trial about frankly other illegal conduct unrelated and unbeknownst to Ms. Hofstetter or others. There was no doubt a conspiracy operating in this clinic that was testified to by some former employees and former patients who all testified that they had to hide that conduct from Ms. Hofstetter. That she was very strict about rules being followed. There was no particular evidence and in particular Ms. Hofstetter was convicted of an 841 count for which Ms. Newman was acquitted with regard to a particular prescription. There was no evidence at all presented at trial regarding Ms. Hofstetter's knowledge of that prescription other than not even that she knew it existed. The evidence of that prescription was its existence. I think in the context that becomes more significant for Ms. Hofstetter, it's a subjective knowledge requirement applies. If the 841 conviction is... If your client's 841 conviction is upheld, is that even if the 856 instruction is deficient, would it still be harmless error with respect to your client? I mean, their clients were not convicted under 841, but yours was. So if that conviction is okay, are you in a different position vis-a-vis a harmless error argument than they are? Frankly, I would contend that that is additional evidence of the lack of harmlessness. That the underlying provider was acquitted of the conduct for which my client was convicted on an 841 that she could not have issued that prescription. She did not issue that prescription. And the provider themselves was in fact acquitted of that count. That goes on all the time in criminal cases that a jury can acquit one person in a conspiracy and convict somebody else, right? Yes, absolutely, Your Honor. And this was a substantive distribution count. And so the 841, which I think is significant, to Ms. Hofstadter, which resulted in an additional 160-month consecutive sentence for her, that one count. So it's the difference between 200 and nearly 400 months for her on the 841 count, in addition to the issues that we've raised in the briefing and that my colleagues have raised today. Okay. Okay, thank you. You'll have your rebuttal. May it please the Court, my name is Brian Samuelson and I represent the United States. The defendant's convictions remain sound after Ruan and should be affirmed. I'd like to cover three points because I do think there is an analytical difference between the 856 instructions and the 841 instructions. First, the 856 instructions conveyed the requisite mens rea here. Second, the 841 instructions also conveyed the requisite mens rea. Now, that wasn't quite clear when the government submitted its brief, but it has become clear in light of Anderson. And third, that if there was any instructional error here, it was harmless. It didn't really change that much. I mean, the argument was available to you, the same argument that was available in Anderson. That's true, John. You guys didn't make it here. I mean, you guys are conceding that they – I mean, I'm – frankly, I'm more skeptical about the 856 instruction than I am about the 841 instruction. And the 841 instruction seems to parrot the one in Anderson, so, you know, maybe it's okay, although we should discuss all of the extra kind of extraneous objective things that were thrown in. But I don't see anything in the 856 instruction that links the lack of authorization to a mens rea. What am I missing? Where is that in the 856 instruction? I think it's in the word purpose, Your Honor. The instruction told the jury the defendants had been charged with acting for a particular purpose, and that purpose was to illegally distribute controlled substances outside the usual course of professional practice. I'm looking at pages 158 and 159 of the jury instructions in particular. It says, charged for the purpose of illegally distributing controlled substances outside the usual course of professional practice. Now, purpose implies knowledge. You cannot act with a particular purpose without knowing what that purpose is. So if the defendant's purpose was to illegally distribute drugs outside the course of professional conduct, they must have known that drugs were being distributed illegally outside the course of professional conduct, that is, without authorization. So the knowledge requirement through the word purpose is baked into the 856 instructions. Did defense counsel object to that part put into the instructions? No, Your Honor. They did not object to the 856 instructions, which is why the plain error standard applied when the court examined these exact same instructions the last time around, and they should be analyzed for plain error again this time. So I think that the plain language of the 856 instructions incorporates this idea of purpose and therefore of knowledge that is required by RUAN. So on their face, the 856 instructions contain all that RUAN. Did you cite any cases that said that purpose essentially gets you to an intent mens rea? Well, the Supreme Court, Your Honor, has analogized purpose to sort of specific intent and knowledge to a sense of general intent. So if I act with the purpose of hitting somebody, I have a specific intent, and that is, in fact, maybe even a higher mens rea than just acting with knowledge that I might hit somebody. I would point you, for example, to Bailey, which is a 1980 Supreme Court case that makes that sort of relationship between purpose and knowledge, the purpose. I mean, it seems like, I guess, the problem I have with that is that the purpose, it's for the purpose of illegally distributing controlled substances, and then you have the separate clause kind of outside the usual course of professional practice and not for legitimate medical purpose. And I'm trying to figure out where that latter part is kind of linked to a subjective mens rea. I mean, perhaps it's with purpose, but then we do get to the problem of kind of the instruction does talk about that being an objective standard, not a subjective standard. So if I'm looking at that second part of that instruction and that clause and the only other thing I've got in these instructions suggests that that's objective, why don't I have a problem at that point? Well, I would make two points, Your Honor. First, in these three instructions, that clause that you're outside the usual course of professional practice and not for legitimate purpose isn't the only thing in the instructions. We also have the word illegally. So the purpose must be the illegal distribution of controlled substances, and the defendants cannot have thought that they were illegally distributing controlled substances and have thought that they were acting as authorized by law. So I think the word illegally does a lot of work in this context as well. Well, but like on page 196, it says, Cal 13, et cetera, et cetera, for the purpose of illegally distributing Section Schedule 2 controlled, right? It says illegal. And then when you go down to line 19, it says, defendant knowingly opened, used, or maintained a place that was permanently, temporarily, and second, that the defendant did so for the purpose of distributing any controlled substance. There's no illegal in there. I mean, it doesn't even say distributing any controlled substance in the course of legitimate medical purpose or practice or whatever it is. It just says for the purpose of distributing the controlled substance, which is what a pain clinic does. So there's no illegal there. I'm supposed to look at the one and just ignore the fact that it doesn't appear in the other one? No, Your Honor, and that was exactly the issue that was on appeal the first time around, which is that the elements as listed on page 56 don't include the word illegal, and this court rightly concluded that the summary of the counts that immediately precedes it makes it clear that illegality is required. Well, yeah, but you're right, except that Ruan changes the landscape a little bit, and so now we're trying to figure out, well, okay, we have a case, went to a jury before Ruan. Is there anything in here that suggests that the jury knew that they had to find a mens rea, a subjective intent, with regard to the accept as authorized? And, I mean, we're looking at the word illegal as one of those things, right? I mean, that's your argument. But I'm just saying I see illegal there. I don't see it, and as we said in the first opinion, the word illegal is not in the statute. So if you're going to parrot the statute and those instructions are okay, that was fine, but that was pre-Ruan, so I'm not sure that gets us very far. I think where that gets us is that the instructions as a whole, including the summary of the indictment immediately preceding the elements, makes it clear that the purpose of the place must be the illegal distribution of drugs. And purpose of illegally distributing drugs gets us to the Ruan knowledge requirement. You cannot act with a particular purpose without knowing what that purpose is. And if the purpose is the illegal distribution of drugs... Yes, but is the jury told an illegal distribution means that they knew that it fell outside of the normal course of medical practice? In other words, yes, you're saying illegal, which encompasses the non-authorization, but I'm not sure the jury is told that. I'm not sure the jury knows what that is supposed to be. And I understand they didn't ask for it, but that's where, you know, again, we're here because of a Supreme Court case. So, I mean, I'm not sure how the jury is linking the illegal distribution to the subjective requirement on the authorization. I think it's through that word purpose. And the common-sense definition of the word purpose is the reason something is done. And if you act with a particular purpose, you have to know what that purpose is. If you don't know that drugs are being distributed illegally, that cannot be the reason that that thing is done. So I think it's just a very common-sense dictionary definition of the word purpose, Your Honor, that would inform the jury of the knowledge requirement here. Did defense counsel request the definition of illegal transfer of drugs at all? No, Your Honor, I don't believe that they did. What was their position about this instruction that you're talking about? Your Honor, there was no objection to the 856 instruction. So it would have to be plain error. It would have to be plain error, yes. I'd like to turn to the 841 instructions because there the court analyzed a very similar instruction in Anderson. It held that the deliberate ignorance instruction, which was virtually verbatim to the one that was given here, was sufficient to convey the mens rea required by rule law. The instructions in this case are very similar. If anything, the elements of 841 are stronger here than they were in Anderson. And so Anderson teaches us that that kind of instruction is sufficient to convey the rule on mens rea requirement. I would point out, I think there was some discussion about whether the deliberate ignorance instruction also relates back to the 856 instruction. I think in terms of proximity that they do. The 856 instruction ends on page 200 of the jury charge. The deliberate ignorance instruction occurs on page 202 almost immediately after. In the deliberate ignorance instruction, there's no limiting language that says this only applies to 841. So the problem on the 841, it seems to me, is we have all of this, yes, and we have the verbatim Anderson language that ends on page 203. And then we get into things that Anderson doesn't seem to have. I don't know whether you looked or not. But it's got objective language with regard to good faith, reasonably believed. And then we get, you know, the burden of proof is on the government to prove to you beyond a reasonable doubt that the defendant acted without a legitimate medical purpose outside the course of usual professional practice. So it just says act. It doesn't say knew, was aware, whatever. And then it says the usual course of professional practice means that the practitioner has acted in accordance. Again, just action, not any knowledge. And then we get the, you know, we get the statement about it being from an objective and not a subjective viewpoint. And then we get the Tennessee Pain Treatment Act, which talks about a physician who knows or should know about a patient. I mean, there's a lot of objectivity in there. There's four or five times where there's something mentioned that looks objective and not subjective. And it seems to me that in both Ruan and in Kahn, both the Tenth Circuit and the Eleventh Circuit said that kind of objectiveness sprinkled in with subjective language taints the instruction. Well, I'm not sure that last part is quite right, Your Honor. So in the portion of the jury instruction that you're referring to, the court was trying to define what it means to be authorized. And there's a distinction between whether something is in fact authorized and whether the defendant knows that something is unauthorized. So after Ruan, the defendants must have subjective knowledge that their conduct crosses the line. But the line itself is still defined with respect to objective criteria, like usual course of professional practice and outside the scope of, you know, without a legitimate medical purpose. Ruan tells us that those are objective criteria. So the statement that the usual course of professional practice is to be determined from an objective and not a subjective viewpoint is entirely consistent with Ruan. When layered with 856's purpose language... Isn't it a little bit ambiguous? I mean, it says the objective viewpoint, and then you've got these defendants that are in front of you. And I'm supposed... And I'm really supposed to know whether this defendant thought they were acting within the usual course. I'm told it's objective. Why am I not concluding at that point, well, it looks like I'm just supposed to measure whether the reasonable prescriber would have done this. Well, I think there's... I mean, it's not clear. It doesn't seem clear to me, I guess, that that's true. And I don't know... You know, obviously, we're talking about a jury instruction that has some parts of it that seem good and some parts of it that I'm not sure about. Your Honor, I would make three points. The first is 856 has this word purpose, and that implies knowledge. The second is that the instructions have the deliberate ignorance instruction that Anderson says conveys to Ruan Menzraya. And I do think that relates back to the 856 instruction. Well, I'm just talking about 841 for now. I'm just... Because I'm curious about 841. 841, we have Anderson. We have the exact language. We have extra language. And I guess the question... We have a published decision. We're bound by it. What do we do with this extra language? And I guess your answer is, well, it falls within that Ruan paragraph that I have been reading, too, which is, oh, well, this is all about an objective standard. You have to consider that when you're looking at subjective knowledge, right? Yes, Your Honor. That's the answer, right? With regard to 856, does any of that objective discussion in that part of the transcript pertain to 856? It is stated and said in the context of counts 14, 16, and 18. Does it relate back because of the language on 156 or whatever? You know what I mean. What page is it? 158, 159, where they're talking about the usual course of professional practice, not for legitimate medical purpose. In other words, when the court says, you may use the Tennessee pain statute to look at the meaning of some of these terms, does that pertain to count 13 also, or is it just limited to 14 and 16 and 18? I think it might relate back, Your Honor. I certainly think the deliberate ignorance instruction would relate back in the sense that they're just defining what it means to have knowledge of an offense or of a fact. There's no reason that that... So you're saying if that part of it related back, all of 841 probably related back, you would get the benefit of the entire thing relating back. What I'm saying is the objective part, some of the language I was reading is an objective-type standard, okay? And it's used to specifically define outside the usual course of professional practice, not for legitimate medical purpose, right? That statement appears on page 158 and 159 with respect to count 13, okay, 11 and 13. If the objective parts that are later stated with respect to count 14 are imported into that part of the instruction, it seems to me to undermine the argument that purpose does enough work to get the subjective intent there. But you're suggesting that the 841 deliberate indifference would also kind of relate back so that if the 841 instruction is okay for that, the 856 instruction would be. Yes, Your Honor, I think that's right. I do think that the definition of what is authorized, that is professional, you know, within the course of professional conduct and usual legitimate medical practice, Ruan says that those are objective criteria, so I do think that is still a correct statement of the law after Ruan, even if... But why, okay, but like, for example, the good faith definition says it means a defendant acting in accordance with what she reasonably believes to be proper medical practice. Okay, reasonably believe, that's an objective standard, right? Yes, Your Honor. Why is that not the same problem that the 11th Circuit and the 10th Circuit have already said is reversible or has to go back? I mean, that good faith, those two cases, specifically we're dealing with objective language in the context of a good faith instruction. Well, there's a couple of distinctions there. One, the defendant did not object here to the good faith standard. So if we were reviewing the instructions for error in the good faith standard, it would have to be reviewed for invited error at most, and that was not the case in the 10th or 11th Circuits where they requested a particular good faith instruction or objected to the good faith instruction. So I think, one, the standard of review is much different. Two, the elements of the charges, you know, the specific jury instructions in those cases looked different. In the 11th Circuit Ruan case, the elements of 841 as listed did not clearly divorce knowledge from authorization. I think that's a clear juxtaposition from the 856, for example, instruction here, which lists purpose only a few words away from authorization. And similarly in Kahn, the instructions there did not convey any sort of mens rea so that the instructions themselves were faulty in a way that the instructions here were not. So both of those are distinguished. I would also say here as a matter of logic, the good faith instruction was not incorrect. If a defendant reasonably believes that they are acting within authorization, then they do not have the knowledge required by Ruan, and they are not guilty. And that's what that instruction says. So as a matter of logic, it's not going to mislead the jury in this case. It does not diminish the mens rea required by the word purpose in 850. I mean, as long as the mens rea is conveyed properly someplace else. Yes, and it is both through the word purpose and through the deliberate ignorance instruction that Anderson says is sufficient. Now, in any event, if you are not convinced that the jury instructions were adequate in this case, there is a strong harmless error argument that any error was not prejudicial in this case. And as Your Honor pointed out, as to the nurse practitioners, in fact, we were reviewing only for plain error, which is a lower standard, just a reasonable probability that but for the error, the outcome of the proceeding would have been different. And the defendants cannot prove a reasonable probability that different jury instructions would have led to a different outcome. I think there's overwhelming evidence here that all four defendants knew that their behavior was not authorized by law. Isn't it the case, at least with respect to Womack, Clemens, and Newman, that they weren't convicted of the 841 counts? That suggests to me that the instruction on 856 might have mattered with regard to the knowledge, especially since their defense was basically we were acting legitimately. I'm not sure that would be harmless or wouldn't have affected their substantial rights under plain error. Well, I don't know that we can infer much from the acquittals on the 841 counts. There are, of course, different offenses with different elements. A finding that they did not distribute drugs, those specific drugs on those specific dates is not, I don't think, indicative of anything about whether they maintained the business for the purpose of illegally distributing drugs. So I don't think there's much information to be gleaned there, Your Honor. What we do know is that there was overwhelming evidence that everybody associated with these clinics knew that they were pill mills. We don't have any evidence that anybody associated with the clinics remained ignorant of the fact that drugs were being distributed illegally in these places. The nurse practitioners prescribed only opioids, almost exclusively, extremely high doses. They turned away people who were ineligible for opioids for one reason or another. But they hardly talked to them at all, didn't they? Hardly talked to them at all, Your Honor. That is absolutely true. There was expert testimony that zero of the charts that they reviewed met standards for adequate charts, that zero of the prescriptions that were reviewed served a legitimate purpose. And there was ample evidence that they did not perform individualized assessments that would be required to practice medicine. Reported pain levels stayed constant across charting in a way that it's clear that they were not asking their patients, their paying patients whether their pain was any different than it was before. There was no follow-up on risk factors, like the fact that people would answer surveys that indicated they might have substance abuse problems. There were no follow-up on that. And they each prescribed drugs in very similar proportions in a way that would be extremely unlikely to happen if they were actually engaged in the practice of medicine. So I think particularly under a plain error standard, but under any standard, even harmless error, there's no reasonable probability that a differently instructed jury would come to a different result. And that applies equally as well to Hofstetter. There is evidence that she was told directly that these clinics were pill mills and were operating outside the law. We have a written report with essentially those words that was given to her. She ordered staff to shred evidence in patient files to shred evidence that they had been discharged from other clinics so that they could become new patients at her new clinic. And she told employees without a medical license to attend to patients when there were no medical providers available. She cannot have thought that that was authorized. So even under a harmless error standard, no reasonable jury could conclude that somebody who was told the things she was told and did the things she did believed that her conduct was authorized. You certainly contested some of that testimony, did she not? Your Honor, yes, she did. But for example, we have the report that was given to her that says this is a pill mill. It said something very close to this is the most egregious example of operating outside the bounds of authority that I have ever seen. So we know that she was told that. So I don't think a reasonable jury could discount that evidence. We also know that the jury, particularly as to Hofstetter, made the knowledge finding up and down the verdict form. In the money laundering counts, they were told that to convict on the money laundering, they had to find that Hofstetter acted knowingly. I'm quoting, that is, with knowledge that the transactions involved proceeds of a criminal offense. That is the knowledge requirement required by Rulon. They convicted her on those counts. Same thing with money laundering conspiracy. They had to find that she knew the property involved in the financial transaction, presented the proceeds of some form of unlawful activity. That is the knowledge finding. And they found that to be true when they convicted her on those counts. As just discussed, they also convicted her of the drug premises conviction, which includes the purpose, that she knowingly and intentionally maintained business for the purpose of illegally distributing controlled substances outside the scope of professional practice and not for a legitimate purpose. And then there are conspiracy conviction counts. They had to find that she agreed to, without authority, distribute drugs. So they are making the Rulon finding up and down the verdict form. By my count, nine times. There's no reasonable probability that they would have made a different finding as to the 841 counts. So because... Does that pertain to all defendants or just to Hofstetter? That argument that the jury made that finding elsewhere in the verdict form just applies to Hofstetter because she is the one that was acquitted of these other... I'm sorry, not acquitted, convicted of these other counts, money laundering, conspiracy. What is the... With regard to the other three, what are we looking at on harmless error? We're looking... Well, or... One, it would be substantial, right? Whatever the prong three of the plain error test. Yes, Your Honor. It would be plain error, which means that the defendants have the burden to show there's a reasonable probability that the verdict would have been different, which is a much lower standard than harmless error. And then we're looking at just overwhelming evidence that the practitioners were operating so far outside the scope of professional practice that they must have known that what they were doing was unauthorized. We're also looking at evidence that everybody that came into contact with these clinics knew that they were not authorized. You know, testimony... The uncontested testimony from the patients was that they would walk into the waiting rooms and know that this was no different than a trap house or a drug den, that people were here... To get Judge Cole's question, they contested that, right? I mean, that was a contested issue? I don't think that... I mean, the evidence we have that these patients were there to receive drugs was not... Well, they're... I mean, whether they were acting with a legitimate medical purpose or not. Was that contested? Yes, Your Honor, it was. I think... So if the error is on that issue, I mean, which is where we would be if under Ruan, it's hard to see why that wouldn't meet the standard, but I... I mean, you can argue about the mountains of evidence, but I take it that they... You know, once they contest it and it's a key issue in the case, I mean, it's an important issue in the case, right? They're... What they're saying, their defense kind of... That was their defense. Yes, Your Honor. It was certainly a key issue in the case. Now, is there a reasonable probability that the outcome of the case would have been different in light of the mountains of evidence, as you put it, Your Honor? No, I don't think that there is. So I think the plain error standard coupled with the overwhelming evidence certainly is a ground to affirm. Okay. So, Your Honor, for those reasons, the 856 instructions conveyed mens rea both through the word purpose and through the deliberate ignorance instruction that Anderson tells us conveys the Ruan requirement. The 841 instructions conveyed the knowledge requirement through the deliberate ignorance instruction  I urge you to affirm. Okay. So at this point, I guess with the... If we were to take into consideration, you know, consideration of the word purpose, the government's position is now, I mean, that Anderson would completely control here. I mean, we're bound, you think, by Anderson at this point. Yes, Your Honor, I think you are. The Rule 28 J letter says that... Something to the effect that Anderson provides an alternate basis to affirm under 841. I'm just wondering if maybe it's the primary basis. Yes, Your Honor, I certainly think it could be. And by alternate basis... Yes, Your Honor, and by alternate basis, I just mean that you could also affirm based on harmless error so that there are multiple ways to get to the same spot. But certainly, I believe that Anderson controls here. He does teach the exact same deliberate ignorance instruction that was given here, conveys the knowledge requirement of Rouen, and we have that here, and I think that's the end of the inquiry. Okay. Thank you. Thank you. All right. Rebuttal? Thank you, Your Honor. You know, to start off with, I would like to mildly push back to the suggestion that there was never a subjective good faith instruction provided. During the charge conference, there was a request for a Volkman type instruction, and there was discussion that went on between the judge, the government, and all the parties, and very specifically, the court said that that brings in a subjective standpoint and under current Sixth Circuit law, that we can't have subjective – it can't be subjective. It has to be objective, and the court rejected it. And the instruction that we were talking about at the time, it didn't – we had not determined where anything would fall when we discussed the instructions. So we didn't know that it was going to be grouped together in that general statement of law. We didn't know whether it was going to precede all the counts or whether it was going to come after the end of all the counts. We just talked about it. We asked for it. We told the judge that we wanted it. He said, I can't do that under current Sixth Circuit law, and I think Godosky was the case that was cited by the judge in that particular instance. Well, you had a chance later to suggest something else, didn't you? I don't think so, Your Honor. This was just before instructions were given to the jury? We did the charge conference near the end of the trial. We had a break. We had two days of charge conference, or one half day and then a full day of charge conference. Brought back in the jury for maybe one day of questioning. We were provided with the final draft of the jury instructions. But you had a chance to object then and add more language, right? I didn't understand it to be that way. The judge said, here are the final instructions that I'm going to give. We'll talk about it during the – my understanding was, Your Honor, and I apologize for talking over you. I get excited about an issue occasionally. But my impression from the judge was when we came out of the charge conference that we were done discussing the jury charges, that that was going to – Did you get a chance to file any objections or whatever you wanted as a substitute or anything like that? No, not after the charge conference, no. It was discussed at the charge conference. That was going to be the final – conceptually, I guess, Your Honor, you can always file an objection at any time that you want to. And after the jury is instructed, you can make a suggestion, right? But as a practical matter, when you're sitting in front of a trial judge, that you're trying to not just – you're not trying to curry favor, but you're trying not to tick off the one person that may be responsible for the fate of your client. You just don't – as a practical matter, you don't go continually filing objections to things that he's already told you how he wants to handle it. And so as a trial strategy matter, I don't know whether that was my consideration or not, but I knew that the judge had told us that here's what I'm going to do and I'm not going to give you the subjective instruction. So that's where we stood on that. But, no, you are correct that after he issued the final jury instructions, I did not file an objection to them. I don't recall when we got the final jury instructions, whether it was a day or two before the jury was charged. I don't recall there being a great deal of time between the issuance of the final instructions and the charging of the jury. I just wanted to clarify that just a little bit. And the only other thing I really wanted to talk about was the issue of referring to the usual course of professional practice and legitimate medical purpose as being an objective standard. And if you ask me today, having gone through a five-month trial through this court, the Supreme Court, and back down here again, if you ask me to define professional practice, I don't know that I could give you a definition of professional practice other than the term itself because nobody has ever attempted to say what professional practice actually is. So I don't think that you can say that's objective. The courts that have talked about it generally says basically, are you a doctor going into your office, are you writing a prescription, are you doing those things. Okay. All right. I think we understand. After your time expires. Okay. So thank you, Your Honor. I want to talk about one thing that the government said, they said that a lot of this was uncontested. It was very hotly contested during this trial, every bit of it was, particularly with regard to the knowledge these providers had of what was going on with the office staff who was being bribed to bring in sponsors. Those staff members testified that they actively concealed what they were doing from the providers. And there was one clinic employee, Crystal Morgan, the government cites her testimony in their supplemental brief. And Ms. Morgan said that she worked at the clinics until they closed, until the search warrant was excused and they shut them down. She said she never saw anything illegal at the clinics. She said she did not have any issues with Ms. Clemmons, Ms. Newman, or Ms. Womack and thought they were very good providers. There were other, these, Gail Fristo, Dr. Valli and Dr. Blakely, Mark Valli and Dr. Blakely, who were at the clinics before these providers got to work at the clinics. Everything they testified to had happened before our clients even got to the clinics. Clyde Tipton, who was the co-owner who testified at the trial, he said that he set those clinics up to be in compliance with the law. So there was a great deal of evidence in this case that these providers were acting with what they thought, what they thought was within the usual course of professional practice and with legitimate medical purposes. Cynthia Clemmons was actually, there was testimony that she was actually called a bitch doctor by some of the patients because she wouldn't give them what they wanted. She followed the clinic protocols. She didn't go outside those. And there are videos of undercover agents going in and being, and meeting with Ms. Clemmons. She does talk to them. She gives them, she looks at their range of motion. You didn't file an objection to these instructions, did you? No, I did not. So we're taking it under plain error? Do you agree with that? I don't want to agree with that. You have to. But I may have to, but I don't want to agree with that because I don't, I think it's, we do object to, at one point in time we requested a good faith instruction. And judge, this government objected to that. They wanted to remove all the language about subjectivity. And we objected to that. The judge said, well, I'll keep that in there, but I'm going to put in all this other objective language. I'm going to keep that in there too. So there was a discussion about that, about whether or not that would be included in there. But you're correct. We did not file written objections to it. We did object to the removal of the subjective language. And there was that discussion about whether it's subjective intent or objectives to be measured subjectively or objectively. There was that discussion in the record. Okay, Counselor, your time is up. Thank you. Thank you. Your Honors, like the other nurse practitioners, Ms. Womack's, the centerpiece of her defense was her lack of knowledge. And so the district court's failure to provide Rwandan compliant jury instructions on the 856 count was particularly harmful to Ms. Womack. It rose to the level of plain error. There's no question that we can meet that standard in this case. I want to just talk a little bit about Ms. Womack. She was the least experienced nurse practitioner at the clinic. She was part-time. She was an hourly employee. Now, your predecessor as counsel did not file any written instructions for the court to give, right? That's correct, Your Honor. Did she object to the ones that the court did give? She joined in any objection that defense counsel lodged in that case. So an objection for one was an objection for all in this case. Who made the biggest objection? I mean, if she joined somebody else's, was she joining Hofstetter's or Womack's or what? Well, she joined every objection. Everybody else's objections she joined. The refusal to give instructions that encompass subjective, a requirement to show subjective knowledge here. But again, you know, we are talking about an employee who was working there for a very short period of time. She was only licensed as a nurse practitioner for three months of the 11 months that she worked there. She worked limited hours. She had no key to the clinic. She had no supervisory powers. There was a lot of evidence presented at trial that a newly employed nurse would see as an indicator that this was a legitimate healthcare establishment. It had oversight. There was a medical director employed there. There were doctors employed there. And I want to point out that where the government presented circumstantial evidence to show that the defendants knew that it wasn't a legitimate pain clinic, that evidence did not apply specifically to Ms. Womack. For example, the government presented evidence of kickback schemes with respect to drug testing that employees benefited from. But the evidence showed that Ms. Womack was not aware of any kickback schemes, didn't engage in any kickback schemes. The government presented evidence of other employees taking bribes from patients. And there was no evidence that Ms. Womack was offered or accepted any bribes. Okay, counsel. Thank you. Thank you. Thank you, Your Honor. For all of these reasons, Your Honor, we ask that Ms. Womack's 856 conviction be vacated in the case for mandatory neutrality. Thank you. Thank you. Counsel? Very briefly, Your Honors, I just want to address a couple of the factual assertions made by the government and to piggyback on a comment made by Ms. Womack's counsel. With regard to the evidence on kickback schemes, bribes, there's also no evidence that Ms. Hofstetter knew of any of those things happening. That's the evidence I was referring to being hidden from her. That was the testimony at trial. She also knew nothing of those kickbacks and schemes that were going on with regard to the drug testing inside the clinic. Mr. Reagan referenced the fact that Clive Christopher Tipton testified at his clinics in order to operate legally in compliance with the law. He did testify to that, as did the other business partner, Mr. Rodriguez from Florida. He testified he intended he and his partners with Ms. Hofstetter intended these clinics to be operated legally. In fact, he wanted to build something he could pass down to his daughters. So I just want to clarify that point, Your Honor. With regard to the government's assertion that there was a mountain of evidence that Ms. Hofstetter could not have ignored so that she must have known that prescriptions were being issued in an unauthorized manner, he refers to a report by medical director Dr. Valley who testified at trial and testified that he, in fact, never issued a prescription in an illegal manner. In fact, no prescriber who testified at trial ever testified that they issued a prescription in an illegal manner. The only testimony regarding that was from the competing experts. So all of that evidence was hotly contested, Your Honor. They were following the general instructions that you want us to approve. They were showing that they were working in a properly legal way, right, and seeing patients and putting it in the records and didn't know about any kind of kickbacks and all that. That was the testimony that Ms. Hofstetter had no knowledge of the Thank you, Your Honor. Thank you, counsel. Thank you, counsel, for your helpful arguments. The case will be submitted. And also, I just want to note a thank to Mr. Oldham and Mr. Reagan and Ms. Cravens who are, I believe, appointed through our CJA program. Thank you very much for your service. We really appreciate the bar stepping up on these cases. So thank you.